STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-12-122
JAW _ Cum – 4/9/2013

STATE OF MAINE,

Plaintiff

JUDGMENT

v.

DANIEL B. TUCCI, a/k/a
DAN THE HANDYMAN, and
TPDF, LLC,

Defendants

STATE OF MAINE
Cumberland. ss. Clerk's Office

APR 0 9 2013

RECEIVED

## BEFORE THE COURT

This matter comes before the court on the complaint of the Plaintiff, the State of Maine

through its Attorney General, alleging multiple violations of the Unfair Trade Practices Act

(UTPA), 5 M.R.S.A. §§ 207, 209 (2002), against Defendant, Daniel B. Tucci, a handyman. The

Plaintiff seeks permanent injunctive relief, civil penalties for intentional violations of the UTPA,

restitution for consumers, as well as its costs of suit and investigation. The matter was tried to

the court without a jury. After fully considering the testimonial and other evidence, the court

concludes that the Plaintiff is entitled to judgment, injunctive relief, restitution and civil

penalties.

The Attorney General's multi-count complaint alleges several violations of the UPTA,

including engaging in a pattern or practice of unfair or deceptive acts by: (1) falsely advertising

that he is licensed, and by threatening and intimidating consumers in response to their

complaints; (2) collecting payment in advance from consumers for home repair and maintenance

services that he has failed to perform; (3) providing home repair and maintenance services to

consumers that are incomplete, shoddy, and unworkmanlike; and (4) refusing to correct such

1

work or to pay refunds. Mr. Tucci's defense consists of three affirmative defenses: failure to state a claim, accord and satisfaction, and the doctrine of laches.

The court tried this case on January 22, 2013 through January 25, 2013. The court heard testimony from the following witnesses: Alexander Goranov; Barbara Webster-Querry; Michael Glennon; Mary Wilcox; Sarah Cote; Andrea Olas; Pauline Kenniston; Julie Newcomb; Stanley Main; Barbara Ashley; Cindy Castaline; Wilhelmina Flaherty; Judith Dow; Bryan G. Moore, loan officer; Patrick Ouellette, Senior State Electrical Inspector for the State of Maine; Richard Steller, Building Inspector for the City of South Portland; Tony C. Hafford, Owner of TC Hafford Basement Systems; Lorraine Monroe; Anna Troiano; David Waltz; Timothy Williams; Conrad Boisvert; and Daniel B. Tucci.

## FACTS

In this case, the evidence allows the court to find the following facts, and discloses several violations of Maine's UTPA as well.

### A. False Advertisements

Defendant, Daniel B. Tucci (Tucci) a Maine resident, had been advertising his services as a handyman in various publications throughout Cumberland and York Counties from 2004 through 2012. There is no dispute that Tucci was at all material times engaged in the business of providing home repair and maintenance services to Maine consumers. In advertising his handyman services, Tucci targeted mostly elderly consumers and represented himself under different names, including "Dan the Handyman" and "Tripol Handyman Services." Moreover, in giving written job proposals to consumers, Tucci represented himself under additional different names, including "The TrixiePolly Co.," "TriDan," "Tripol Construction," and

2

"T.P.D.F., LLC." Tucci was the sole member of T.P.D.F., LCC (hereinafter T.P.D.F.), and its alter ego.[1]

Tucci's advertisements either stated or implied that he was competent and licensed in several trades, including electrical, masonry, plumbing, roofing, and oil burner services. Tucci's advertisements also implied that Tucci had many years of experience in indoor and outdoor carpentry. Tucci is not a licensed electrician and holds no other professional licenses. Tucci admitted that he intentionally misled consumers into believing that he held several professional licenses prior to 1989. In light of the evidence, however, the court finds that these intentional misrepresentations continued through 2012.

On February 24, 2010, York County District Court issued a Consent Order and Agreement in which Tucci was fined $75.00 for performing unlicensed electrical work on a consumer's home in Saco. The Consent Order permanently enjoined Tucci from personally performing any electrical work, in any place, at any time, without an appropriate and duly issued State license to do so. Tucci admitted that, after the Consent Order was issued, he possessed neither a permit from the City of Saco to perform the work, nor any type of license issued by the State of Maine to install electrical wiring or perform electrical work. In clear violation of the order and state licensure requirements, Tucci subsequently and intentionally performed extensive, unlicensed electrical and plumbing work on Julie Newcomb's home between October 2010 and February 2011. Tucci intentionally performed similar unlicensed electrical work for several other Maine consumers between June 2010 and November 2012.[2] According to the

---

[1] Tucci exclusively controlled T.P.D.F. as well. On December 3, 2010, T.P.D.F. was administratively dissolved for failure to appoint and maintain a registered agent for the limited liability company in the State of Maine.

[2] In the summer of 2010, for example, Pauline Kenniston hired Tucci to perform, among other things, some electrical work on her home that she had just recently purchased. Ms. Kenniston

3

state's expert witness, Patrick Ouellette, Senior State Electrical Inspector for the State of Maine, Tucci's process of performing the electrical work himself and having a licensed electrician subsequently inspect Tucci's was still violative of state licensing requirements.

## B. Taking Advance Payments For Work, Then Failing to Complete the Work

In 2004, Tucci began entering into contracts with Maine consumers for home repair and maintenance, and represented that he could complete the work. Although Tucci was often "more than happy to help," he required substantial down payments from consumers in advance of providing his services or materials. More than ten witnesses testified that Tucci's payment scheme actually required "half up front."[3] In contracting to perform a specific home improvement or repair, Tucci's projects were "painfully slow" from the start and often came with unusual or unwarranted delay. Tucci used these delays to persuade many consumers to enter into additional contracts concerning extra work that Tucci claimed needed to be done, either to complete the work covered by the initial contract or further home improvements and repairs that were beyond the contemplation of the initial contract.

---

bought the house with the condition that she immediately replace the knob and tube wiring with a safer electrical system. Tucci said that he could perform the necessary electrical work, and Ms. Kenniston reasonably assumed that Tucci was licensed to do so. Tucci expanded the project multiple times and left many of the areas completely undone. Ms. Kenniston felt that the project was nothing short of a "nightmare" and informed Tucci several times of her dissatisfaction with his work. In response, Tucci not only threatened to "call the cops" on her, but also phoned her place of employment to tell her managing partner that she was an "embarrassment to the firm." Tucci neither returned to complete the work nor refunded Ms. Kenniston any portion of the payments she directed to Tucci.

[3] In the summer of 2010, for example, Sarah Cote hired Tucci to remodel her bathroom and replace certain windows and doors. They agreed to $4,900 for the entire bathroom. Ms. Cote's advance payments to Tucci consisted of $1,200 to replace six windows and $1,200 for labor. Tucci never even ordered the windows. Tucci began work in the bathroom, but Ms. Cote subsequently paid more money for the same amount of work, resulting in a total of $7,476. Among Ms. Cote's several justifiable complaints about Tucci's work, several doors were not properly measured and poorly installed, there was no support installed under the tub, Tucci's plumber flooded three floors, and the downstairs ceiling partially came down because of the plumber's mistakes. Tucci never returned to complete or correct the work.

4

In the case of Frank Gallagher, who hired Tucci in May 2009 simply to replace a bathtub in an upstairs bathroom, Tucci persuaded him to write out a total of five checks over a three-week period for a "litany of reasons." Tucci pocketed $2,596 with Mr. Gallagher receiving almost nothing in return. Absent proper tools, Tucci and his crew used tools loaned by Mr. Gallagher to leave the bathtub and bathroom in worse condition than before the work had started. Tucci not only pocketed the advance payments and refused to refund Mr. Gallagher any of the money, but also left a hole in the bathroom floor, incomplete drywall around the bathtub, and water stains through the kitchen ceiling. The State presented several other witnesses who testified to the "constant barrage of new contracts" and how the number of concurrent payments confused many of Tucci's consumers.[4] After having received these advance payments, it was Tucci's standard practice to discontinue communication with consumers and make it exceedingly difficult for them to contact him directly – with the hope that they would not pursue any sort of refund. The court, therefore, finds that Tucci intentionally engaged in the deceptive practice of taking payments in advance from consumers for work that he failed to perform.

C.     **Providing Shoddy, Unworkmanlike, and Incomplete Work, and Refusing to Correct Such Work or to Pay Refunds**

In view of the evidence presented, the court also finds that Tucci intentionally engaged in the practice of providing handyman services to consumers that were shoddy, unworkmanlike, and incomplete, and refused to correct such work or to pay refunds. The evidence clearly established a number of instances, in addition to Frank Gallagher's bathroom, in which Tucci's handyman services amounted to inadequate workmanship, with the most flagrant example relating to his work on Robert and Wilhelmina Flaherty's house. The Flahertys, an elderly

---

[4] In reference to Ms. Julie Newcomb, Tucci negotiated over ten proposals between October 4, 2010 and November 8, 2010.

couple, hired Tucci to waterproof their basement, remove a sump pump, and build a playroom for their grandchildren. After paying Tucci over $80,000 in advance payments, almost all of the necessary work was left either incomplete or not even started at all. When the Flahertys, several months later, finally ended their business relationship with Tucci, the basement contained more water than ever before and the cement poured in the basement was still wet. The Flahertys hired TC Hafford Basement Systems to correct Tucci's shoddy work on the basement and outside their home. TC Hafford Basement Systems corrected all of the existing problems and charged the Flahertys $14,000, which is an amount in stark contrast to the $145,000 that the Flahertys paid Tucci for the same exact services. Almost all of the consumers who testified had to hire subsequent contractors to correct and finish Tucci's shoddy work. Moreover, Tucci not only refused to correct his shoddy, unworkmanlike, and incomplete work, but also refused to pay refunds for such work.[5]

## D. Threatening and Intimidating Practices

The court, based on the evidence provided at trial, finds that Tucci intentionally engaged in the unfair practice of threatening and intimidating consumers. According to more than several witnesses, Tucci exhibited a friendly demeanor at the outset of each project, but Tucci became

---

[5] For example, Alexander Goranov hired Tucci in 2004 to repair several stairwell foundations affixed to his apartment building. Tucci quoted Mr. Goranov $1,100 for each stairwell repair, and Mr. Goranov paid $1,100 and $550 to Tucci. The work, however, did not meet Mr. Goranov's satisfaction and Tucci ultimately agreed. Tucci promised Mr. Goranov that he would return to complete the work, but Tucci never returned. He later notified Mr. Goranov that he had been involved in an accident and promised to refund Mr. Goranov for his unsatisfactory work as soon as he received compensation for his injuries. Tucci never refunded Mr. Goranov.

more belligerent and threatening toward consumers whenever the consumers expressed dissatisfaction with his work.[6] Tucci threatened to sue consumers for breach of contract, called consumers' places of employment stating that said consumers were not fit for employment, drove by consumers' homes after contract termination and consistently reminded consumers that he knew where they lived – "I know where you live. I will find you. No one does this to me."[7]

The number of complaints about Tucci and Tucci's home repair and maintenance business finally resulted in this suit brought by the Attorney General seeking remedies for

---

[6] In reference to Tucci's unfair practice of threatening consumers, one of the most egregious cases involved Masuto Wing. Ms. Wing, who was a proud, 80-year-old Japanese woman living alone in South Portland, hired Tucci to replace the gutters and repair the exterior of her roof. Tucci performed some of the work without any staging apparatus. Tucci anticipated that Ms. Wing would not be able to make the necessary payments, and subsequently approached a loan officer that he knew to see if the loan officer would lend Ms. Wing additional funds. Tucci wanted to facilitate this loan transaction so that Ms. Wing could pay Tucci to perform more work on her home. When the loan officer arrived at Ms. Wing's home, he was initially concerned with Tucci's poor workmanship and the obvious need to cover the exposed roof in case of rain. The loan officer became more concerned when Tucci approached Ms. Wing to explain that he planned to perform extra work on her house. Ms. Wing became visibly upset because she thought the work had already been done, which was when Tucci verbally lashed out and told her that she was old and blind. In addition to Ms. Wing's down payment of $3,500, Tucci admitted that, without her permission, he charged $9,800 to Ms. Wing's credit card before her meeting with the loan officer. According to the loan officer, Mr. Bryan G. Moore, the total invoice amount was approximately $22,000. Mr. Moore notified the South Portland Police Department, and Tucci was ultimately charged with theft in that case.

[7] In May 2010, for example, Barbara Webster-Querry hired Tucci to repair, among other things, several leaks in her chimney and foundation issues in her garage. She paid Tucci $1,250 in advance, and Tucci promised to begin the work immediately. The next day, one worker appeared but never returned after his lunch break. Tucci said that he would complete the work as promised, but no one ever returned to her house to finish the work. Ms. Webster-Querry tried to contact Tucci over the next several months, but Tucci was on vacation. In the meantime, she hired other contractors to fix what needed to be done. Tucci not only accused her of breaching the contract, but also threatened to sue her and screamed: "You're taking food out of my children's mouths." Ms. Webster-Querry became more fearful of Tucci when he said that he would come to her house. He had already threatened to sue her with his "Harvard lawyer" and even put a lien on her house. The issue was partially resolved in Ms. Webster-Querry's favor after several proceedings in small claims court.

7

multiple violations of the Maine UTPA. The suit is properly brought by the Attorney General under the Maine UTPA as in the public interest to protect future consumers. 5 M.R.S. § 209.

## DISCUSSION

Maine's UTPA, 5 M.R.S.A. §§ 205–A to 214 (2012), provides protection for consumers against unfair and deceptive trade practices. The UTPA declares unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *State v. Weinschenk*, 2005 ME 28, ¶ 11, 868 A.2d 200 (quoting 5 M.R.S.A. § 207). The Attorney General, pursuant to 5 M.R.S.A. § 209, is authorized to "bring an action when there is reason to believe that a person is using or is about to use an unfair method, act or practice, and the proceeding is in the public interest." *Id.* ¶ 12. In promulgating the UTPA in 1969, the Maine Legislature intended to bring Maine law into accordance with "the federal interpretations of 'unfair methods of competition and unfair or deceptive acts or practices[,]'" as set forth in the Federal Trade Commission Act. *Id.* (quoting *Bartner v. Carter*, 405 A.2d 194, 199-201 (Me. 1979); 5 M.R.S.A. § 207(1)).

Maine's UTPA does not precisely define the terms "unfair" and "deceptive." *Weinschenk*, 2005 ME 28, ¶ 15, 868 A.2d 200. Therefore, "[t]he definitions of 'unfair' and 'deceptive' are questions of fact and whether a particular act or practice is 'unfair' or 'deceptive' is determined on a case-by-case basis." *MacCormack v. Brower*, 2008 ME 86, ¶ 5, 948 A.2d 1259.

In order to justify a finding of unfairness, the act or practice must cause, or be likely to cause, substantial injury that is not reasonably avoidable by consumers, and the harm is not outweighed by a countervailing benefit to consumers or competition. *Weinschenk*, 2005 ME 28, ¶ 16, 868 A.2d 200. Furthermore, an unfair method, act or practice, "may be identified based on

8

a group of separate, individual business transactions that display a common pattern of unfairness or deceit." *Id.* ¶ 12.

In regard to a deceptive act or practice, the Court has adopted the "clear and understandable standard," which states that "an act or practice is deceptive if it is a material representation, omission, act or practice, that is likely to mislead consumers acting reasonably under the circumstances." *Weinschenk*, 2005 ME 28, ¶ 17, 868 A.2d at 206. "An intent to deceive is not required." *MacCormack*, 2008 ME 86, ¶ 5 n.2, 948 A.2d 1259 (citation to footnote only).

The court, based on the evidence presented, finds that Defendant Daniel B. Tucci has engaged in multiple violations of the Maine UTPA, 5 M.R.S.A. §§ 207, 209. First, Tucci's advertisements, which stated or implied that he was licensed and competent, were false, misleading and deceptive, in violation of 5 M.R.S.A. § 207. Second, Tucci's unfair practice of providing handyman services to consumers that were shoddy, unworkmanlike, and incomplete, and refusing to correct such work or to pay refunds, is violative of 5 M.R.S.A. § 207. Third, Tucci's unfair practice of taking payments in advance from consumers for work that he failed to perform is in violation of 5 M.R.S.A. § 207. Lastly, Tucci's unfair practice of threatening and intimidating consumers also violates 5 M.R.S.A. § 207.

## DEFENDANT'S AFFIRMATIVE DEFENSES

Defendant's three affirmative defenses are rejected by the court. As to the argument of accord and satisfaction, Tucci has failed to carry his burden of proof on this issue. The doctrine of laches does not apply in the circumstances of this case. The consumers acted promptly once they were aware that they had valid claims that they could pursue against Tucci.

## REMEDIES

As remedies, the Plaintiff seeks permanent injunctive relief, civil penalties, restitution, plus attorney's fees and other costs. These remedies will be discussed separately.

The Plaintiff introduced substantial evidence relating to the specific restitution amounts for consumers who had, in fact, suffered ascertainable losses due to Defendant's unlawful practices. Defendant introduced little evidence to contest Plaintiff's asserted amounts.

**A. Injunction.** The court will issue an injunction designed to protect the public from future unfair trade practices, permanently enjoining Defendant Tucci and T.P.D.F., together with any entity in which they have an ownership interest, from operating any home repair or handyman business pursuant to 5 M.R.S. § 209.

**B. Restitution.** Section 209 of Maine's UTPA provides restitution for consumers who have "suffered any ascertainable loss" due to Defendant's unlawful practices and a $10,000 civil penalty for each intentional violation of the Act. The court orders restitution to consumers as follows:

| | | |
|---|---|---:|
| 1. | Julie Newcomb | $ 11,855.00 |
| 2. | Pauline Kenniston | $ 3,325.00 |
| 3. | Rick and Terri Cote | $ 6,155.00 |
| 4. | Michael Glennon | $ 3,000.00 |
| 5. | Alexander Goranov | $ 1,650.00 |
| 6. | Mary Wilcox | $ 4,125.00 |
| 7. | Andrea Olas | $ 166.00 |
| 8. | Robert and Wilhelmina Flaherty | $ 141,359.50 |
| 9. | Barbara Webster-Querry | $ 2,200.00 |
| 10. | Stanley Main | $ 1,135.00 |
| 11. | Frank and Noel Gallagher | $ 2,596.00 |
| 12. | Judith Dow | $ 2,210.00 |
| 13. | Barbara and Richard Ashley | $ 55,349.00 |
| 14. | Masuto Wing | $ 9,800 |

**C. Civil Penalties.** Section 209 of Maine's UTPA allows the court to impose a civil penalty of not more than $10,000 for each violation. In finding fourteen violations in this case, the court orders Defendant to pay up to $140,000 in civil penalties. However, in light of the substantial restitution amounts that Defendant has already been ordered to pay to consumers, the $140,000 amount in civil penalties is fully suspended on the condition that Defendant pays a minimum of $250 per month toward the restitution amounts for a period of ten years. The restitution payments are payable in full, in the amounts set forth in paragraph B above, through the Office of the Attorney General for the benefit of consumers consistent with this opinion.

**D. Costs.** The court will award the Plaintiff's costs upon presentation of a bill of costs, not including attorney's fees.

## ENTRY

For the reasons stated above, the entry is:

(1) Judgment for the Plaintiff on Counts I, II, III, and IV.

(2) The Defendants, together with any entity in which they have an ownership interest, are PERMANENTLY ENJOINED from operating any home repair or handyman business.

(3) The Defendants are jointly and severally ORDERED to pay restitution in the amount of $236,500.50, payable through the Office of the Attorney General for the benefit of consumers consistent with this opinion.

(4) The Defendants are jointly and severally ORDERED to pay civil penalties in the amount of $140,000, but these civil penalties will be fully suspended on the

11

condition that Defendant pays a minimum of $250 per month toward the restitution amounts for a period of ten years, payable through the Office of the Attorney General.

**(5)** The Defendants are jointly and severally ORDERED to pay the Plaintiff its costs upon presentation of a bill of costs, not including attorney's fees.

DATED: April 9, 2013

_____
Joyce A. Wheeler, Justice